ATTORNEY FOR APPELLANT
Kimberly A. Jackson
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
Curtis T. Hill, Jr.
Attorney General of Indiana

Christina D. Pace
Deputy Attorney General
Indianapolis, Indiana



FILED

Feb 15 2017, 11:38 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

# In the
# Indiana Supreme Court

No. 21S01-1702-JV-84

J.D.M.,

*Appellant (Respondent below),*

v.

STATE OF INDIANA,

*Appellee (Petitioner below).*

Appeal from the Fayette Circuit Court, No. 21C01-1209-JD-257
The Honorable Beth A. Butsch, Judge

On Petition to Transfer from the Indiana Court of Appeals, No. 21A01-1510-JV-1804

**February 15, 2017**

**Massa, Justice.**

J.D.M. was adjudicated a delinquent for committing acts which, if committed by an adult, would constitute Class C felony child molestation, and was subsequently ordered to register as a sex offender. J.D.M. appeals, claiming that the statutory prerequisites for placing a juvenile on the sex offender registry were not met. We agree, and reverse.

**Facts and Procedural History**

J.D.M. was born in 1996, and "has experience[d] a lot of trauma in his life." Appellant's App. at 214. During his early childhood, at the age of five or six, J.D.M. stated that he was "sexually abused by two adult strangers." Appellant's App. at 69. His younger brother also died around this time. This coincided with J.D.M. becoming defiant with authority, attempting to run away from home, and even attempting suicide. J.D.M.'s mother and father divorced shortly thereafter, and J.D.M. moved with his mother to live near his cousin, whom he identifies as his aunt. During this period J.D.M. also received intermittent treatment for his behavioral issues, with some success. His mother was obese, causing her numerous health problems requiring hospitalization, during which times J.D.M.'s cousin or father would care for him, and he would have to move to their homes. J.D.M.'s mother passed away when he was thirteen due to heart complications. J.D.M. was on probation at the time,[1] and violated it shortly after he got the news, resulting in a six-month hospital stay. After his release, J.D.M. went to live with his cousin in Texas, before moving back to live with his father in May 2011.

Over the course of the next year, J.D.M.'s condition rapidly deteriorated. He gained approximately 200 pounds, with the goal of obtaining the same weight as his mother before she died. He continued to engage in aggressive and defiant behaviors such as theft and arson, though he was not adjudicated for these offenses. He also developed enuretic and encopretic conditions[2] with no discernible cause, resulting in his being expelled from high school and being taught privately at the local library. During this time he continued in therapy, and was "diagnosed with ADHD, Oppositional Defiant Disorder and Bipolar II disorder." Appellant's App. at 21.

---

[1] The record on appeal is unclear as to precisely why he was on probation.

[2] Involuntary bladder and bowel movements, respectively.

On September 19, 2012, J.D.M., now age fifteen, was in his bedroom with a nine-year-old boy, who was the son of J.D.M.'s older brother's girlfriend. J.D.M. instructed the boy to remove his pants, and J.D.M. did the same. J.D.M. had the boy lie on top of him, and stated that both boys had erections. J.D.M.'s older brother found them, called for his father, and they called the police.

J.D.M. was charged with being a delinquent child for committing child molestation which, if committed by an adult, would constitute a Class C felony. At the detention hearing, J.D.M.'s father told the juvenile court that he did not want J.D.M. to come home because he was "more or less disgusted with him the way he's been." Tr. at 13. The juvenile court ordered placement of J.D.M. at the Wernle Youth and Family Treatment Center, and for Wernle to perform a comprehensive Diagnostic Evaluation of J.D.M. On October 11, 2012, Wernle reported that J.D.M. "appear[ed] to be suffering from traumatic grief," and determined that he "present[ed] a high risk to sexually re-offend, without proper treatment interventions." Appellant's App. at 68, 73. On November 2, 2012, Lisa Day of the Fayette Probation Department filed her Pre-Disposition Report ("PDR"), which reviewed Wernle's Diagnostic Evaluation, and "request[ed] that youth be placed into the Sexually Maladaptive Program at the Wernle Youth and Family Treatment Center." Appellant's App. at 92. The PDR did not contain a recommendation that J.D.M. be placed on probation.

J.D.M. subsequently admitted to the allegations, and was adjudicated a delinquent. The juvenile court continued his placement at Wernle pending a formal dispositional hearing, which took place on January 16, 2013. At that hearing, both sides agreed that his continued treatment at Wernle was the best course, and then moved on to the issue of probation. The trial court initially suggested that he be formally placed on probation at that time; Officer Day suggested otherwise: "My thoughts are um, as far as placing J. I guess on formal probation my thoughts are that we order him into Wernle to complete his treatment *once he has completed treatment we come back and at that time place him on formal probation* using the sex offender guidelines." Tr. at 26 (emphasis added). Both the State and J.D.M.'s counsel agreed with this approach, and the juvenile court consented, stating "we'll continue the placement at Wernle and we will address um, the conditions of probation and all that when you're ready to be released from Wernle." Tr. at 28.

3

The accompanying dispositional order "approve[d] of the probation officer's recommendation in the PDR" and continued placement at Wernle, *without a formal entry that J.D.M. was on probation*. Appellant's App. at 109. The order did state, however, that the Fayette County Probation Department would have "responsibility for the placement and care of the child," and would be required to "file a report every three months after the date of this order on the progress made on implementing the decree." Appellant's App. at 110. The court also notified J.D.M.'s school of the adjudication, and left blank the portion describing his "sentence or juvenile law disposition." Appellant's App. at 112.

While at Wernle, J.D.M. began his treatment for sexually maladaptive behavior. During this period J.D.M.'s father died, resulting in guardianship passing to his cousin. At subsequent review hearings on June 19, 2013, October 16, 2013, and January 15, 2014, Officer Day and Wernle both reported J.D.M. continued to make "minimal to moderate progress" in his treatment areas, and recommended his placement at Wernle continue. Appellant's App. at 120–24, 130, 133, 142. The trial court agreed each time, noting that "no change is made in the dispositional decree" originally entered January of 2013. Appellant's App. at 128, 144. The juvenile court ordered a permanency plan which found that J.D.M. was "progressing well in said placement," with the goal that J.D.M. return to his cousin's home upon completion of treatment. Appellant's App. at 136–37.

On May 14, 2014, Officer Day again reported that J.D.M, now age seventeen, was making "minimal to moderate progress" in treatment. Appellant's App. at 145. However, this report also revealed that J.D.M. had suffered even more personal setbacks. First, his cousin had moved back to Texas, resulting in "limited contact." Appellant's App. at 145; Tr. at 43. Second, J.D.M. revealed in therapy that he had been sexually abused by his father and his older brother; this report eventually led to his brother's incarceration. No family appeared for J.D.M. at this review hearing, and the juvenile court again continued placement at Wernle.

As J.D.M.'s eighteenth birthday neared, the juvenile court expressed to the parties the need to hold a sex offender registration hearing. The initial hearing was held on October 27, 2014, and

Wernle provided a detailed report in advance of the hearing. The report noted the significant progress J.D.M. had made during his time at Wernle, such as "definite indications of truthfulness" on his polygraph test with respect to his sexual history, and that he had lost 84 pounds. Appellant's App. at 159. Nevertheless, the report still found he had a "high risk of sexual recidivism" due to his continued viewing of inappropriate pornography, social isolation and underdevelopment, and his continuing grief and trauma from childhood. Appellant's App. at 165. Dr. Soper, who prepared the report, further testified at the hearing that J.D.M. was at "moderate to high risk" to reoffend, but that that could diminish with continued treatment. Tr. at 63–64. The juvenile court took the matter under advisement, but did not rule on the registration requirement, finding that it should conduct another hearing on the matter 15 days prior to J.D.M.'s release from Wernle.

When J.D.M. turned eighteen, he was transitioned to the Wernle's Semi-Independent Living Program (Kolsky Hall), and Officer Day reported he was "doing well." Appellant's App. at 190. At the February 11, 2015 review hearing, the representative from Wernle stated they could provide J.D.M. with such services "up to a day before his 22nd birthday." Tr. at 83. However, J.D.M. did not assimilate well at Kolsky, and was placed back in the primary facility in April, though he did complete the requirements to obtain his GED. Officer Day also testified at the June 10, 2015 review hearing that she was looking into transitioning J.D.M. to a group home, as his treatment regimen was nearing completion.

An additional sex offender registry hearing was held on August 11, 2015. Wernle provided a new report in advance of this hearing, which found J.D.M. was at "moderate risk of sexual recidivism." Appellant's App. at 213. Dr. Soper again testified, this time that J.D.M. was at "low to moderate risk for re-offense." Tr. at 113. On September 8, 2015, the juvenile court issued an order that required J.D.M. to register as a sex offender, finding the State had provided clear and convincing evidence that J.D.M. was likely to reoffend. The juvenile court set accompanying conditions of probation, including the registration requirement, on September 30, 2015. J.D.M. appealed, and our Court of Appeals affirmed via memorandum decision. J.D.M. v. State, No. 21A01–1510–JV–1804, 2016 WL 2986962 (Ind. Ct. App. May 24, 2016). We hereby grant transfer and vacate the Court of Appeals decision below. Ind. Appellate Rule 58(A).

**Standard of Review**

"Whether the trial court's registration order meets the requirements of the Sex Offender Registration Act is a matter of statutory interpretation." N.L. v. State, 989 N.E.2d 773, 777 (Ind. 2013). Statutory interpretation is a "pure question of law," which we review *de novo*. Id. "Our first task when interpreting a statute is to give its words their plain meaning," considering the text and structure of the statute as a whole. ESPN, Inc. v. Univ. of Notre Dame Police Dep't, 62 N.E.3d 1192, 1195 (Ind. 2016). Only if the text is ambiguous do we turn to the canons of statutory construction, guided by the goal of discerning and effectuating the intent of the legislature. Sloan v. State, 947 N.E.2d 917, 922 (Ind. 2011).

**The Juvenile Court Could Not Order J.D.M. to Register as a Sex or Violent Offender Prior to His Discharge from Wernle.**

The Indiana Sex Offender Registration Act ("SORA"), Indiana Code section 11-8-8-19(a) (2016), requires a "sex or violent offender" to register for ten years, beginning when the offender: "(1) is released from a penal facility . . . or a secure juvenile detention facility . . . ; (2) is placed in a community transition program; (3) is placed in a community corrections program; (4) is placed on parole; or (5) is placed on probation." Indiana Code section 11-8-8-5(b)(2) further defines "sex or violent offender" to include juveniles who commit delinquent acts that would qualify as sex offenses if committed as an adult. However, as we noted in N.L., SORA imposes additional prerequisites for juvenile registration, which "implicitly recognizes, and attempts to balance, the tension between registration's harsh effects and the juvenile system's rehabilitative aims." 989 N.E.2d at 778. Specifically, the juvenile court may order registration only if the child:

(A) is at least fourteen (14) years of age;

(B) is on probation, is on parole, is discharged from a facility by the department of correction, is discharged from a secure private facility (as defined in IC 31-9-2-115), or is discharged from a juvenile detention facility as a result of an adjudication as a delinquent child

6

for an act that would be an offense described in subsection (a) if committed by an adult; and

(C) is found by a court by clear and convincing evidence to be likely to repeat an act that would be an offense described in subsection (a) if committed by an adult.

Ind. Code § 11-8-8-5(b)(2).

This Court has previously interpreted subsection (C) in detail. In J.C.C. v. State, we held that the juvenile court was required "to hold an evidentiary hearing to determine whether the juvenile is likely to be a repeat sex offender." 897 N.E.2d 931, 934 (Ind. 2008). J.C.C. further emphasized that "[w]hen a juvenile is placed in . . . a secure private facility . . . , the sex offender registry hearing cannot be held until after the juvenile is released from the facility. We believe that the legislative intent here is to hold the sex offender registration determination in abeyance so that the juvenile has the opportunity to be rehabilitated during detention." Id. (internal citations omitted). The J.C.C. Court went on to find that there was not clear and convincing evidence that the juvenile was likely to repeat the offense, because the testifying expert based his recommendation on the juvenile's pre-detention conduct, and thus did not "analyze whether the juvenile ha[d] been rehabilitated subsequent to disposition."[3] Id. at 936.

We interpreted subsection (C) again in N.L., holding that, although the initial registry hearing in February contained all the proper procedures for a formal hearing, such as representation by counsel and application of the rules of evidence,

> its continuation in May did not. Again, it was well within the trial court's discretion to continue the February registry hearing to develop further evidence of whether N.L. had rehabilitated—but once it had done so, each continuation of the hearing had to meet the

---

[3] Indiana Code section 11-8-8-5(c) mandates that the trial court consider such expert testimony before ordering a juvenile to register as a sex offender under subsection (C).

same standard for an "evidentiary hearing" before issuing its decision on whether N.L. must register. . . . Information or reports received at informal review hearings are not an appropriate substitute for deciding a matter as weighty as whether to require a juvenile to register as a sex offender.

989 N.E.2d at 780. The N.L. Court found the registration order further deficient under subsection (C), holding that the juvenile court "must *expressly* find, by clear and convincing evidence, that a juvenile is likely to reoffend before it may place the juvenile on the sex offender registry." Id. (emphasis in original).

In both J.C.C. and N.L., this Court emphasized that such strict construction of the juvenile sex offender registration requirement was necessary to accomplish the express statutory goal of "ensur[ing] that children within the juvenile justice system are treated as persons in need of care, protection, treatment, and rehabilitation." Ind. Code § 31-10-2-1(5) (2016); N.L., 989 N.E.2d at 778 ("The stakes of juvenile sex-offender registration . . . are significantly different than where adult offenders are involved."); J.C.C., 897 N.E.2d at 935 ("[T]he statutory scheme for dealing with minors who commit crimes is vastly different from the statutory scheme directed to adults who commit crimes. This policy is consistent with the State's primary interest in rehabilitation, rather than the punishment of juvenile delinquents.") (internal citations omitted).

With this context in mind, we turn to the instant matter. J.D.M. challenges the registration order under subsection (B), claiming he was neither on probation nor had he been released from a secure treatment facility. The State counters that the Fayette County Probation Department did have "responsibility for the placement and care of the child," and thus J.D.M. was effectively 'on probation' for purposes of Indiana Code section 11-8-8-5(b)(2)(B). State's Br. at 13 (quoting Appellant's App. at 110). Moreover, it was also "imminent that [J.D.M.] was going to be placed on probation and released to a less secure placement," and the State asserts there is "no requirement that the juvenile court release [J.D.M.] to probation before holding a hearing to determine if he is

8

required to register." State's Br. at 13–14. We find J.D.M.'s argument persuasive, for several reasons.[4]

First, at the dispositional hearing on January 16, 2013, the issue of probation was extensively discussed, and at the probation department's *suggestion*, the juvenile court stated "we'll continue the placement at Wernle and we will address um, the conditions of probation and all that when you're ready to be released from Wernle." Tr. at 28. The dispositional order, accordingly, did not state that the juvenile court was ordering J.D.M. to be on probation. The record is clear that, even if the probation department had certain supervisory responsibilities regarding J.D.M.'s treatment and care, he was *not* "on probation" for purposes of section 11-8-8-5(b)(2)(B). Indeed, the notice the court provided to J.D.M.'s school left *blank* the section describing his "sentence or juvenile law disposition." Appellant's App. at 112. Where there is such apparent intent to hold in abeyance any formal disposition until after the child is released from treatment, we cannot say that the "on probation" prerequisite of Indiana Code section 11-8-8-5(b)(2)(B) was satisfied.

Second, the registration order itself made no express finding that J.D.M. was on probation, instead stating that J.D.M. "has remained in residential treatment/placement at Wernle from September 21, 2012 throughout the date of the sex offender registry hearing." Appellant's App. at 217. We emphasized the importance of an express finding under subsection (C) in N.L., noting that in the absence of such a finding, "it is impossible to determine on review whether the trial court properly applied the heightened [clear and convincing] evidentiary standard—or even whether it was making an individualized determination, as the statute requires." 989 N.E.2d at 780. We believe the analysis of N.L. should apply with equal force to subsection (B), since ambiguity on this issue is equally capable of hampering our appellate review. Accordingly, before

---

[4] Because we find this issue dispositive, we decline to address J.D.M.'s argument that there was not clear and convincing evidence that he was likely to reoffend.

entering an order requiring a juvenile to register as a sex offender under Indiana Code sections 11-8-8-19(a) and 11-8-8-5(b)(2), the juvenile court must expressly find that one of the conditions stated in section 11-8-8-5(b)(2)(B) exists.

Third, the dispositional order stated that Wernle is a "non-secure facility," and neither party appears to challenge that assessment. Appellant's App. at 109. Thus by definition, even if J.D.M. *had* been released from Wernle, that would be insufficient by itself to satisfy Indiana Code section 11-8-8-5(b)(2)(B), since he would not have been "discharged from a *secure* private facility." (emphasis added).

Fourth, although his release from Wernle was "imminent" according to the State, J.D.M. remained at Wernle at the time of the second sex offender registry hearing, at the time the registration order was actually entered, and, indeed, through the time of briefing in this appeal. State's Br. at 13. In J.C.C., we stated unequivocally that "[w]hen a juvenile is placed in a DOC facility, a secure private facility, or a juvenile detention facility, the sex offender registry hearing cannot be held until after the juvenile is released from the facility." 897 N.E.2d at 934. Again, this was based on our legislature's directive that juvenile punishment be centered on rehabilitation, and thus "an evaluation of whether a juvenile has been rehabilitated *while in detention* is a prerequisite to finding clear and convincing evidence that the juvenile is likely to repeat." Id. at 936 (emphasis added). We see no reason why this logic should not also extend to rehabilitative non-secure placements such as this, made before a formal entry of probation. Until J.D.M. is actually released and placed on probation, the possibility of his continued rehabilitation at Wernle exists, and should be allowed to develop. Indeed, the court reports and testimony reveal that J.D.M.'s risk of sexual recidivism decreased *in between* the two sex offender registry hearings in this case. Accordingly, we find that the juvenile court erred in conducting its sex offender registry hearings while J.D.M. remained at Wernle.

**Conclusion**

For the foregoing reasons, we reverse the order requiring J.D.M. to register as a sex offender, and remand this matter to the juvenile court for proceedings consistent with this decision.

Rush, C.J., and Rucker, David, and Slaughter, JJ., concur.